**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **ANGELA CAMP,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:20-CV-364 (MTT)** |
| | ) | |
| **CIRCLE K STORES, INC.,** *et al.*, | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## <u>ORDER</u>

Defendants Circle K Stores, Inc. and David Rader have moved for summary judgment on all of Plaintiff Angela Camp's various discrimination and retaliation claims.[1] For the reasons stated below, that motion (Doc. 22) is **GRANTED in part** and Camp's state law claims are dismissed for lack of jurisdiction.

## I. BACKGROUND[2]

### A. General Background

During the relevant period, Camp, a Caucasian female, was employed by Defendant Circle K.  Camp began working for Flash Foods, which Circle K subsequently acquired, as a customer service representative in 2010, and she was promoted to an assistant store manager in 2011.  Doc. 29-2 ¶¶ 6-7.  In August 2018, Camp was

---

[1] Plaintiff Angela Camp urges the Court to "summarily deny" the defendants' motion for summary judgment because it was filed one day late.  Doc. 29 at 2.  That is patently frivolous.  The August 29, 2021 deadline for the defendants' motion fell on a Sunday.  *See* Fed. R. Civ. P. 6(a)(1)(C).

[2] Unless otherwise stated, the facts are undisputed and are viewed in the light most favorable to the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).

promoted to store manager. *Id*. ¶ 12. Camp's job duties included "supervising employees, ensuring employees met performance goals, hiring, scheduling, and terminating employees, as well as the day-to-day operation of the store." *Id*. As explained in detail below, Camp's tenure as a store manager was short-lived; she was demoted in March 2019, and her employment with Circle K ended later that year.

## B. Camp's Time as a Store Manager

As a store manager, Camp reported to the market manager, who oversaw multiple stores in the area. Doc. 29-4 at 39:1-9. Lisa Sorrow, the market manager for Camp's area, left in November 2018, and the position was filled by David Rader, an African American male. Docs. 22-1 ¶ 25; 29-1 ¶ 25. Then, Camp says, is when her problems began.

Camp claims that while she was store manager, Rader treated her differently than the other store managers he supervised. Doc. 29-3 ¶ 12. Specifically, Camp alleges that Rader asked her, but not other store managers, to clean out a storage room in her store so that he could have an office when he visited. *Id*. Camp also alleges that once when she was counting her store's nightly deposit, Rader "instructed [her] to leave the deposit in the desk to fix a [window] sign," a violation, Camp says, of Circle K's policy on leaving money unattended. *Id*. ¶ 15. According to Camp, "Rader never instructed male or African-American managers to violate Circle K policy or to engage in manual labor tasks while performing managerial duties." *Id*.

In January 2019, Rader gave Camp a verbal warning for excessive spoilage and for failing to timely report a lottery cash shortage. *Id*. ¶ 16. Camp contends the spoilage warning was unfair because she was "instructed to stock products despite

demand and Rader did not issue warnings to other Store Managers whose stores also experienced spoilage," and she claims the reprimand for the shortage was "not factually accurate." *Id*.

Camp also claims that she experienced discriminatory treatment when her store was remodeled in early 2019. *Id*. ¶ 17. Camp asserts that Rader would not allow her to schedule the necessary employees to timely complete the remodeling, even though he did allow African American store managers to schedule additional staff. *Id*. Camp subsequently received two reprimands from Rader for failing to timely complete her store's remodeling. *Id*. ¶¶ 17-18, at 48-49. The second reprimand occurred on February 27, 2019, the same day Camp told the employees in her store that she was pregnant. Camp told Rader that she was pregnant a few days after the reprimand, during the first week of March. Docs. 29-3 ¶ 18; 29-4 at 69:17-25.

## C. Camp's Demotion and Subsequent Events

On March 14, 2019, Rader demoted Camp to a customer service representative. According to Camp, Rader stated that she was "not moving fast enough" and "not getting things done quickly enough." Docs. 22-1 ¶ 40; 29-1 ¶ 40; 29-3 ¶ 22.[3] The defendants state that Camp was demoted because "she failed to demonstrate an ability to successfully perform the job duties of the Store Manager position." Doc. 22-14 at 9.

Because Camp claims her demotion was retaliatory, the Court notes the timing and substance of her potential protected activity. First, Camp alleges that at some time

---

[3] Throughout her brief and affidavit, Camp states that Rader was referring to her pregnancy when he stated she was not getting things done fast enough. Docs. 29-3 ¶ 22; 29 at 8, 25 ("Rader stated that I was not moving fast enough to suit Rader and that I was not getting things done quickly enough—referring to my pregnancy.") (internal quotes omitted). However, Camp testified that Rader never referred to her pregnancy when he made these criticisms, and she does not explain how these criticisms were connected to her pregnancy. Doc. 29-4 at 86:19-21.

during the "Fall or Winter of 2018," she asked Angela Surles, the manager of another Circle K location, who to contact about an issue with a supervisor.  Surles suggested Camp contact Lisa Sorrow, Rader's predecessor.  Doc. 29-4 at 48:6-49:9.  On March 8, 2019, Camp sent Sorrow a message stating that she was "having a problem here and my problem is with [Rader].  So I can't go to him. … What should I do."  Doc. 29-3 ¶ 20. Sorrow told Camp that she should contact human resources, which is the procedure found in Circle K's associate handbook.  *Id*.; Doc. 29 at 18; 29-4 at 27:14-29:5, 126:24-129:12, 129.  On March 11, Camp called human resources "to see who [she] was supposed to communicate with," and was told to put her concerns in an email.  Docs. 29-3 ¶ 20; 29-4 at 130:19-25.  Instead, Camp emailed human resources on March 16, two days after her demotion, and asked to speak with someone "to lay out all the details of the issues I'm having."  In the email, Camp explained that her problem was with her market manager, but she did not say what her specific issues were and did not mention any sort of discrimination.  Doc. 29-4 at 172.  In a return email, Camp was given a phone number to speak with Amanda Kildrow, a human resources manager, but Camp claims the phone number "inoperable."  Docs. 29-2 ¶ 40; 29-4 at 132:15-25.  Camp is unsure whether she contacted Kildrow around the time of her demotion.  Doc. 29-4 at 133:1-19.

After Camp's March 14, 2019 demotion, she was assigned to work at a different Circle K store under store manager Katrina Trivette, a Caucasian female.  Docs. 22-1 ¶ 43; 29-1 ¶ 43.  But Camp had problems with Trivette as well.  Camp testified that Trivette scheduled her to work at times when she was unavailable and that Trivette did not teach Camp how to operate the store's cash register system.  Doc. 29-4 at 92:3-

93:15.  Camp asked Rader to move her to another store, which he did.  *Id*. at 93:16-94:22.

Camp was assigned to another nearby Circle K, the manager of which was also a Caucasian female.  *Id*. at 93:16-95:23.  Camp worked there less than a month, but in that time, she had an incident that she claims caused a miscarriage.  Camp *alleges* in her brief that "[a]fter repeatedly being abandoned to work [alone] which prevented necessary breaks, Camp suffered a subchorionic tear caused by too much heavy lifting and time spent on Camp's feet, that resulted in the miscarriage of one of Camp's twins."  Doc. 29 at 10.[4]  Camp did not know that she was carrying twins before this incident.  Doc. 29-4 at 242:17-243:8.

In April 2019, Camp was transferred to another nearby store, where Matt Hollis, a Caucasian male, became store manager soon after Camp arrived.[5]  *Id*. at 95:21-23, 99:1-21; Docs. 22-1 ¶ 46; 29-1 ¶ 46.  Camp testified that Hollis threatened to reduce her hours or to remove her from the schedule completely when she expressed concern about doing strenuous physical activity because of her pregnancy.[6]  Doc. 29-4 at 101-5-14, 252:17-253:12.  Camp's doctor never told her she needed to be on light duty but did advise her to take restroom breaks and sit down when needed.  *Id*. at 102:6-15.

---

[4] Camp does not argue the relevancy of this medical causation opinion to any summary judgment issue, although she repeatedly alleges that the defendants in various ways caused her miscarriage.  Even if relevant, Camp's medical opinion is both inadmissible and factually suspect.  It is based entirely on Camp's testimony about what she claims some unidentified medical provider allegedly told her.  The medical records in the record, for which neither party has provided a basis for admissibility, do not confirm Camp's opinion.

[5] Although Camp transferred stores often in a short period of time, each store was about the same distance from her home.  Doc. 29-4 at 195:23-25.

[6] Camp stated that her hours were in fact reduced, but that this was because of scheduling issues.  Moreover, she testified that "[i]f [Hollis] had more hours to give me, he would try."  Doc. 29-4 at 202:24-204:2.

Hollis often scheduled Camp to work alone though, which meant she could not sit or use the restroom. *Id*. at 105:16-106:7. Camp theorized that she may have been scheduled to work alone because of her prior experience as a store manager, but she also speculates that Hollis hoped that by scheduling her to work alone she would quit. *Id*. at 107:1-7, 108:14-109:1. But Camp admits that Hollis's store "didn't have that many people for first shift, which is why I got stuck alone." *Id*. at 202:19-22.

Also, in April 2019, Rader offered Camp an assistant store manager position at a nearby store. Docs. 1 ¶ 39; 22-1 ¶ 113; 29-1 ¶ 113. However, Rader said the promotion would not include a pay increase. Docs. 22-1 ¶ 114; 29-1 ¶ 114. Camp now, but not at the time, alleges gender and race discrimination were the reasons she was not offered a raise. But it is undisputed that of the twenty-two assistant store managers under Rader's supervision, Camp was already paid more than twenty of them. Docs. 22-1 ¶ 121; 29-1 ¶ 121. And the two assistant store managers that were paid more than Camp were both Caucasian females. Docs. 22-1 ¶ 122; 29-1 ¶ 122.

**D. Camp's Leave and "Termination"**

Camp requested that her maternity leave under the Family Medical Leave Act ("FMLA") begin on October 27, 2019. Docs. 22-1 ¶ 53; 29-1 ¶ 53. As her anticipated delivery date neared, Camp, on October 25, 2019, emailed human resources to inquire whether her maternity leave would be paid. Doc. 29-4 at 142:1-143:23. In that email she stated, "I have a question about my maternity leave regarding whether it will be paid leave or not. … When I told my market manager I was pregnant, I got demoted from a store manager and in turn lost my manager insurance." *Id*. at 178.[7] On October 28,

---

[7] This was the first time Camp suggested a specific reason for her demotion.

2019, Becky Anderson, Circle K's "absence partner," informed Camp that her leave would be unpaid but that Camp nonetheless was required to submit leave paperwork, such as a leave application and leave certification from her doctor.  Docs. 22-1 ¶ 69; 29-1 ¶ 69; 29-4 at 145:12-22, 176.  Anderson explained that once the paperwork was received, Camp's leave would be approved.  Doc. 29-4 at 176.  Anderson emailed Camp on November 6, 2019 and reminded her that her leave could not be approved until the paperwork was returned.  *Id.* at 174.  Anderson's email explained how to access the paperwork online, but Camp says she encountered technical difficulties.  Docs. 29-4 at 173; 29-3 ¶ 33.  Anderson then emailed Camp the paperwork, but Camp testified that didn't work either.  Doc. 29-3 ¶ 33; 29-4 at 157:23-158:2 ("I don't know if there was a malfunction with my phone or my Workday [Circle K's online program to manage human resources functions].  But that's why I said, mail me the paper.  I want to hold it in my hand, and I'll send it back to you because this computer stuff ain't working.").  In her email exchange with Anderson, Camp mentioned that she had a temporary mailing address, but Camp did not tell Anderson what that address was or confirm that Anderson's files had that information.  Docs. 29-4 at 151:24-152:18, 162:4-163:7; 29-3 at 84.[8]

Anderson mailed the paperwork to Camp, but Camp had moved multiple times, and the paperwork was mailed to a former address.  Docs. 29-3 ¶ 34, at 88; 29-4 at 152:13-18.  On November 13, Anderson mailed a notice (to the same outdated address) stating that if Camp did not return the paperwork by November 20, her leave would be denied and her absences would be unexcused.  Doc. 29-3 ¶ 34, at 110.  The mail was

---

[8] A procedure for obtaining the paperwork was also listed in Circle K's associate handbook.  Doc. 29-4 at 129-132.

returned to Circle K as undeliverable, but it is unclear when Circle K became aware that the documents had not been delivered. Docs. 29-3 at 124-125.

Camp admits that Anderson informed her that the paperwork was necessary for her leave to be approved. Docs. 22-1 ¶ 69; 29-1 ¶ 69. Confusingly, however, Camp also testified that she believed that the paperwork only needed to be returned if she was seeking paid leave, which she was not. Doc. 29-4 at 147:3-23, 217:12-21. In any event, Camp never returned the paperwork. Docs. 29-1 ¶ 76; 29-1 ¶ 76.

On November 18, 2019, Camp gave birth. Doc. 29-3 ¶ 36. Hollis, Camp's store manager, sent a text message to Camp a couple days later congratulating her and stating, "[y]ou can let me know how long your recovery time is and when you would like to return to work whenever you get the opportunity." *Id*. ¶ 37. Camp did not respond to Hollis's text message or contact him about returning to work. Doc. 29-4 at 164:2-166:10. However, on December 13, 2019, Camp was told by a Circle K representative that her leave had been cancelled and that she should contact Anderson. Doc. 29-3 ¶ 41. On December 26, Anderson told Camp that her "employment was terminated because [Anderson] never received the certification documents." *Id*. ¶ 42; Doc. 29-4 at 167:19-168:6. Anderson also told Camp that she could return to work; she "would just need to present a doctor's release returning you to work." Docs. 29-4 at 167:19-168:6; 29-3 at 133. Camp did not return to work, however. Camp assumes Rader made the decision to "fire" her because, as market manager, he made decisions about firing employees. Doc. 29-4 at 171:7-173:14. The defendants contend, however, that Camp was "administratively terminated" because she did not return the leave paperwork, and

thus her absences were unexcused.  Doc. 34 at 11-12.  There is no evidence that Rader took part in Camp's administrative termination.

## II. STANDARD

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'"  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'"  *Four Parcels of Real Prop.*, 941 F.2d at 1437-38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Rather, "the moving party simply may 'show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'"  *Id.* (alterations in original) (quoting *Celotex*, 477 U.S. at 324).  Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial."  *Id.*

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing … relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324).  The non-moving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable, or is not significantly probative' of a disputed fact."  *Id.* (quoting *Anderson*, 477 U.S. at 249-50).  Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may consider the fact undisputed for purposes of the motion.  Fed. R. Civ. P. 56(e)(2). However, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge …. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.

### III. DISCUSSION

Camp has brought multiple claims against Circle K and Rader: pregnancy discrimination under Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act of 1990; sex-based pay discrimination under the Equal Pay Act; sex discrimination under Title VII; race discrimination under Title VII and 42 U.S.C. § 1981; retaliation under Title VII, the ADA, and FMLA; and state law claims for intentional infliction of emotional distress and negligent hiring, retention, and supervision.  Doc. 1 ¶ 1.  Before addressing the merits of Camp's federal claims, the Court must determine what acts or events constitute "adverse employment actions" and whether Camp exhausted her administrative remedies.

**A. Adverse Employment Actions**

The defendants argue that only Camp's demotion and termination constitute adverse employment actions upon which her disparate treatment claims can be based. Camp claims, however, that other incidents constitute adverse employment actions: Rader's order to fix a window sign while she was preparing the nightly deposit; Rader's scheduling restrictions during the remodeling of her store; Rader transferring her to different stores where she encountered scheduling conflicts; and Hollis threatening to reduce her hours or remove her from the schedule. According to Camp, these events "constituted a serious and material change to her employment." Doc. 29 at 5.

The Supreme Court has defined an adverse employment action as "a tangible employment action [which] constitutes a significant change in employment status such as hiring, firing, failure to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). A plaintiff "must show a *serious and material* change in the terms, conditions, or privileges of employment" to establish an adverse employment action. *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001) (abrogated on other grounds). Not all conduct by an employer that negatively affects an employee constitutes an adverse employment action. "[T]he employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances." *Id*. at 1238. To qualify as an adverse employment action, an employer's conduct that falls short of "an ultimate employment decision, must, in some way, alter the employee's compensation, terms, conditions, or

privileges of employment, deprive him or her of employment opportunities, or adversely affect his or her status as an employee." *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008).

The only authority Camp cites in support of her argument that the actions other than her demotion and termination were adverse employment actions is *Watts v. Bibb Cnty., Ga.*, 2010 WL 3937397 (M.D. Ga. Sept. 30, 2010). However, *Watts* is not at all helpful. In *Watts*, the Court found that although a state magistrate judge was not guaranteed another term in office, his supervisor's decision to not appoint him for another term could constitute an adverse employment action. *Id.* at *7. That decision, of course, effectively terminated the judge. Thus, the adverse employment action in *Watts* was quite unlike any of Camp's alleged adverse employment actions, except, of course, her demotion and termination.

More fundamentally, no reasonable person could view Camp's claimed adverse employment actions, other than her demotion and termination, to be materially adverse. None materially affected the terms, conditions, or privileges of her employment. *See Davis*, 245 F.3d at 1239. None deprived her of work opportunities or affected her status as an employee. *See Crawford*, 529 F.3d at 970. Thus, none are adverse employment actions upon which Camp may base a disparate treatment claim.[9]

## B. Exhaustion

The defendants argue Camp did not exhaust claims arising from her March 14, 2019 demotion, which occurred a full year before she filed an EEOC charge, and that

---

[9] Significantly, Camp does not assert a hostile work environment claim based on the totality of events. *See Monaghan v. Worldpay US. Inc.*, 955 F.3d 855, 860-61 (11th Cir. 2020) (explaining the difference between disparate treatment claims, which require an adverse employment action, and hostile work environment claims, which do not).

she did not exhaust her Title VII pay discrimination claim because her EEOC charge did not mention pay issues.

Plaintiffs proceeding under the ADA as well as Title VII must exhaust their administrative remedies by filing a charge with the EEOC before bringing their claims in federal court.  *See* 42 U.S.C. § 12117(a); 42 U.S.C. § 2000e-5; *see also Batson v. Salvation* Army, 897 F.3d 1320, 1327 (11th Cir. 2018) (applying the Title VII exhaustion requirement to an ADA claim).  Plaintiffs bear "the burden of proving all conditions precedent to filing suit[.]"  *Maynard v. Pneumatic Prods. Corp.*, 256 F.3d 1259, 1262 (11th Cir. 2001).  Thus, Camp must show she exhausted her Title VII and ADA claims.

1. *Camp's Title VII and ADA claims arising from her demotion*

Although Camp admits she did not file an EEOC charge within 180 days of her demotion, Camp argues that the demotion was part of a continuing violation.  Doc. 29 at 5-7.  Thus, Camp claims her March 18, 2020 EEOC charge exhausted claims arising from her March 14, 2019 demotion.

The Supreme Court has explained the difference between discrimination claims arising from discrete acts and those arising from hostile work environments.  *Nat. R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002); *see also Monaghan*, 955 F.3d at 860-61.  In both, an EEOC charge must be filed within 180 days of the occurrence of the alleged unlawful employment practice.  But, "[h]ostile environment claims are different in kind from discrete acts.  Their very nature involves repeated conduct.  The 'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.  Such claims are based on

the cumulative effect of the individual acts." *Morgan,* 536 U.S. at 115.  On the other hand, alleged discrete employment actions, such as terminations or demotions, occur on a single day.  *Id*. at 114.  Therefore, to bring a claim of discrimination arising out of a discrete action, an EEOC charge must be filed within 180 days of its occurrence.  *Id*. at 110-15.  Thus, *Powell v. Haverty Furniture Companies, Inc*., upon which Camp relies, affords her no refuge; *Powell* involved a hostile work environment claim based on sexual harassment, not a disparate treatment claim based on specific adverse employment actions such as a demotion or termination.  912 F. Supp. 532, 534 (M.D. Ga. 1996); Doc. 29 at 6.

Here, Camp's Title VII and ADA claims arising from her demotion are based on an obviously discrete act—her demotion.  Because Camp failed to file an EEOC charge within 180 days of her demotion, Camp's Title VII and ADA claims arising from her demotion are time-barred and therefore are **DISMISSED with prejudice**.

   *2.  Title VII Pay Discrimination*

Camp's pay discrimination claim arises from Rader's offer to promote Camp to assistant store manager without an increase in pay.  Doc. 29 at 16-17.  The defendants argue that Camp's "EEOC Charge is devoid of any allegations that Circle K paid her differently from male, non-Caucasian employees … [t]hus [Camp] failed to exhaust her administrative remedies with regard to her Title VII pay discrimination claims."  Doc. 22-14 at 13.  Camp argues that although she "did not specifically reference equal pay in the Charge, … the 'ultimate act' [she] complained about was discrimination based on gender at the hands of Rader."  Doc. 29 at 17.  Camp further argues that she "stated facts from which a reasonable investigator could conclude pay discrimination at Circle

K." *Id*. at 16.  In other words, Camp argues that the allegations in her EEOC charge are reasonably related to an equal pay claim that she did not specifically mention.

Claims in a subsequent lawsuit are typically limited to the scope of the EEOC charge.  *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1280 (11th Cir. 2004).  While claims that "amplify, clarify, or more clearly focus the allegations in the EEOC complaint" are allowed in a subsequent lawsuit, "allegations of new acts of discrimination are inappropriate."  *Id.* at 1279-80 (internal quotation marks and citation omitted).  However, "the scope of an EEOC complaint should not be strictly interpreted," and courts should be "extremely reluctant to allow procedural technicalities to bar claims[.]"  *Id.* at 1280 (internal quotation marks and citation omitted).  "As long as allegations in the judicial complaint are 'reasonably related' to charges in the administrative filing and 'no material differences' between them exist, the court will entertain them."  *Ray v. Freeman*, 626 F.2d 439, 443 (5th Cir. 1980).[10]

Camp's EEOC charge alleged that she was bullied by Rader, she was demoted by Rader because of her pregnancy, and she was terminated for unapproved absences.  Doc. 29-4 at 245.  The charge does not mention Rader's offer of an assistant store manager position or that there was ever an issue with pay.  Camp attempts to analogize her EEOC charge to the plaintiff's charge in *Gregory*, arguing the "ultimate acts" in both charges were discrimination.  Doc. 29 at 17.  But allegations of discrimination are in every EEOC charge, and the "ultimate act" in *Gregory* was the plaintiff's termination.  There, the court held the plaintiff could assert a Title VII retaliation claim arising from her

---

[10] The Eleventh Circuit has adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981.  *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

termination when her EEOC charge did not mention retaliation and only alleged that she was terminated based on her race and sex. *Gregory*, 355 F.3d at 1280.  This was because based on the plaintiff's stated facts, [a]n EEOC investigation of her race and sex discrimination complaint leading to her termination would have reasonably uncovered any evidence of retaliation." *Id*.

Here, none of the facts alleged in Camp's EEOC charge concern a pay issue. Further, an investigation of Camp's allegations would not uncover such an issue. Rather, Camp has asserted completely new and unexhausted grounds of discrimination based on facts of which the EEOC had no notice.

Finally, even if Camp had mentioned a pay issue in her March 18, 2020 charge, it would be time-barred because that charge was filed more than 180 days after Rader's April 2019 offer of a promotion without a pay raise.  Doc. 1 ¶ 39.

Accordingly, Camp's Title VII pay discrimination claim is **DISMISSED without prejudice**.[11]

## C.  Section 1981 Disparate Treatment Claim Arising from Camp's Demotion

Although Camp's Title VII and ADA claims arising out of her demotion were not properly exhausted and thus cannot be litigated, Camp also asserts a § 1981 claim arising out of her demotion, which does not require exhaustion.  *Caldwell v. Nat'l Brewing Co.*, 443 F.2d 1044, 1046 (5th Cir. 1971).  Under § 1981, "[a]ll persons ... shall have the same right ... to make and enforce contracts ... as is enjoyed by white

---

[11] For the reasons discussed in the Equal Pay Act section below, Camp's Title VII pay discrimination claim fails even if it had been exhausted.  It is undisputed that Camp's wage as a customer service representative was higher than twenty of the twenty-two assistant store managers.  And both assistant store managers who earned a higher wage than Camp were Caucasian females.  Docs. 22-1 ¶¶ 120-22; 29-1 ¶¶ 120-22.

citizens," which "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(a)-(b).  The Supreme Court has held that Caucasian plaintiffs may bring claims under § 1981, notwithstanding the statutory reference to white citizens as the comparator group. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 282-83 (1976).  Race discrimination claims brought pursuant to § 1981 have the same elements of proof and are analyzed under the same framework as claims brought under Title VII. *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

      1. *Direct Evidence*

A plaintiff may prove a § 1981 race discrimination case with direct or circumstantial evidence.  Direct evidence is "evidence that, if believed, proves the existence of a fact without inference or presumption.  Only the most blatant remarks whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." *Holland v. Gee*, 677 F.3d 1047, 1055 (11th Cir. 2012).  Camp argues she has direct evidence of discrimination.  Doc. 29 at 7-9.

Regarding her demotion, Camp testified that John Kulper, a non-management coworker who was allegedly treated better than Camp, told Camp that Rader did not like her "because [she is] white and because [she is] a girl."  Docs. 29-3 ¶ 29; 29-4 at 209:1-10.  Camp did not depose Kulper and she offers no basis for the admissibility of her account of what Kulper allegedly said.  But it appears that this statement is merely the "speculation of a non-decisionmaker" at Circle K and is "circumstantial evidence at

best." *Standard*, 161 F.3d at 1333.  Moreover, Camp's testimony reveals that she was attempting to convey her belief that Kulper, who is Caucasian, was treated better than she was because of his gender, not, obviously, his race.  Doc. 29-4 at 209:1-9.

Camp also asserts that Rader's statement about Camp "not moving fast enough and not getting things done fast enough" is direct evidence of discrimination.  However, a factfinder would have to make an inference to connect this statement to any sort of discrimination.  Therefore, this statement is, at most, circumstantial evidence.  In short, Camp has no direct evidence of discrimination.

### 2. *McDonnell Douglas*

The framework for analyzing circumstantial evidence supporting a discrimination claim is found in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Pursuant to *McDonnell Douglas*, a plaintiff must first establish a prima facie case of discrimination. If a plaintiff establishes that prima facie case, the burden of production, but not the burden of persuasion, shifts to the employer to articulate a legitimate, non-discriminatory reason for the employment action.  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254-55 (1981).  To meet this burden, the employer "need not persuade the court that it was *actually* motivated by the proffered reasons" but must produce evidence sufficient to raise a genuine issue of fact as to whether it discriminated against the plaintiff.  *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (emphasis added) (quotation marks and citation omitted).

A plaintiff then has the opportunity to show that the employer's legitimate, non-discriminatory reason is a pretext for discrimination.  This may be done "either directly by persuading the court that a discriminatory reason more likely motivated the employer

or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256.  "If a plaintiff produces sufficient evidence that the employer's proffered reason is merely pretextual, that evidence may sometimes be enough to preclude summary judgment in favor of the employer."  *Kragor*, 702 F.3d at 1309.

In § 1981 race discrimination cases, the *McDonnell Douglas* framework generally requires proof of four elements to establish a prima facie case:

> [A plaintiff] must show that: (1) he is a member of a protected class, (2) he was qualified for the position, (3) he suffered an adverse employment action, and (4) he was replaced by a person outside of his protected class or was treated less favorably than a similarly-situated individual outside of his protected class.

*Maynard v. Bd. of Regents of Div. of Universities of Fla. Dep't of Educ. ex rel. Univ. of S. Fla.*, 342 F.3d 1281, 1289 (11th Cir. 2003).

Here, it is undisputed that Camp was a member of a protected class, was qualified for her position as a store manager, and experienced an adverse employment action when she was demoted.  However, Camp was replaced by a Caucasian female, and the defendants argue that Camp cannot identify any similarly situated non-Caucasian Circle K employees who were treated more favorably.  Docs. 29-4 at 125:2-8; 22-14 at 8.  "[A] plaintiff asserting an intentional-discrimination claim under *McDonnell Douglas* must demonstrate that she and her proffered comparators were similarly situated in all material respects." *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1218 (11th Cir. 2019).

Camp argues that "other store managers who were not … Caucasian, received assistance [and] were not demoted for not moving fast enough."  Doc. 29-3 ¶ 23. Further, Camp argues that "African-American employees, such as Poppy (male) and

Christie (female) were not held [to] the same standards as Camp and were not subjected to discipline when engaging in conduct similar to that resulting discipline Camp received."  Doc. 29 at 12.  Camp further testified that Poppy and Christie, who Camp says were store managers, "didn't have to do everything that I had to do or that other store managers have to do, and they got special treatment compared to everyone else.  It wasn't hard to see that.  Christie, once she clocked in, she didn't even have to work.  As long as she was there, she got paid for it."  Doc. 29-4 at 187:22-188:3.

Camp does not say which African American store managers were given assistance that she was not given.  And at least some of Camp's beliefs concerning Poppy and Christie are explicitly based on rumors: "We used to just hear rumors about how Poppy and Christie were [Rader's] favorites.  Everybody knew they were his favorites."  *Id*. at 187:13-17.  In any event, Camp has not established that Poppy and Christie were similar in all material respects.  Although Camp alleges that Poppy and Christie were not held to the same standard she was and were not disciplined, she admits that she is unaware of their disciplinary history, and Camp does not even allege that they did or failed to do something similar to anything Camp did or failed to do.  Doc. 185:14-186:15; *see Lewis*, 918 F.3d at 1227 (stating a similarly situated comparator will ordinarily have engaged in the same conduct and share the plaintiff's employment or disciplinary history).  In short, general statements and rumors that Rader liked Poppy and Christie, and testimony that Christie did not have to work hard, are insufficient to establish that they were similarly situated in all material respects to Camp.  Therefore, Camp has not established a prima facie case of race discrimination.

But even if Camp had established a prima facie case, she still has not pointed to evidence tending to establish that the defendants' given reason for her demotion was a pretext.  The defendants have stated that Camp was demoted because "she failed to demonstrate an ability to successfully perform the job duties of the Store Manager position."  Doc. 22-14 at 9.  Thus, the defendants have produced a legitimate, non-discriminatory reason for demoting Camp, and Camp must demonstrate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [the defendants'] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence."  *Gogel v. Kia Motors Mfg. of Ga., Inc.,* 967 F.3d 1121, 1136 (11th Cir. 2020) (quoting *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005)).

To show the defendants' proffered reason is unworthy of credence, Camp argues that the defendants "have produced no evidence suggesting Camp could not perform and, even after the demotion, Rader offered to elevate Camp to Assistant Manager." Doc. 29 at 13.  Camp also points to the fact that she earned awards for her management performance.  *Id*. at 15.

First, the defendants have proffered their legitimate, non-discriminatory reason and explained the basis for their decision.  Camp's argument that they haven't proved she couldn't perform her duties misses the point.  It is her burden to demonstrate pretext.  Second, the fact that Camp was offered an assistant store manager position after she was demoted does not undermine the defendants' reason for demoting Camp or show that it is unworthy of credence.  That the defendants thought Camp could be a competent assistant store manager does not at all tend to establish that they thought

she could be a competent store manager.  Finally, the awards that Camp received for management performance were from her tenure as an assistant store manager in 2012 and are thus insufficient and too far removed to show that the reason given for her 2019 demotion from store manager is unworthy of credence.  Most of the evidence offered by Camp to show pretext is irrelevant and none of it creates a jury question as to whether the defendants' proffered reason for demoting her is unworthy of credence.

Camp has not established a prima facie case of race discrimination arising from her demotion because she has not pointed to comparators who were "similarly situated in all material respects."  *Lewis*, 918 F.3d at 1218.  And even if she had made out a prima facie case, Camp has not come forward with evidence to show that the defendants' proffered reason for demoting her is unworthy of credence.  Accordingly, Camp's § 1981 race discrimination claim based on her demotion is **DISMISSED with prejudice**.

## D.  Disparate Treatment Claims Arising from Camp's Termination

Camp has also alleged disparate treatment claims arising from her termination pursuant to Title VII (race and sex discrimination), the ADA, and Section 1981.  *See generally* Doc. 1.  Camp has no direct evidence that she was terminated because of discrimination of any sort, so she must rely on circumstantial evidence to survive the defendants' motion for summary judgment.  The *McDonnell Douglas* burden-shifting framework applies to these claims.  *Lewis*, 918 F.3d at 1221-22 n.5; *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004).

Camp has not established a prima facie case for any of her discrimination claims arising from her termination because she has not shown that she received less

favorable treatment than comparators that were "similarly situated in all material respects."  Other than Poppy and Christie, who were no more similar to Camp when she was terminated than when she was demoted, Camp points to LeShay, an African American employee.  Doc. 29 at 12.  Camp alleges that LeShay was allowed to take maternity leave without being fired.  Doc. 29-4 at 188:10-18.  Importantly, however, Camp admits that she is unsure whether LeShay submitted her leave paperwork, but she assumes that LeShay probably did.  *Id*. at 185:10-13.  Accordingly, LeShay is not similarly situated to Camp, who did not return her leave paperwork.

Camp also mentions that Kulper, a male coworker, was treated better because he was a male.  *Id*. at 219:24-220:7.  Camp bases this belief on the fact that Kulper was allowed to work any shift he wanted at any store he wanted and that Rader would speak to him more congenially.  But Camp admits that Kulper's more favorable treatment occurred months before her termination when Camp held a management position, and Kulper did not.[12]  *Id*. at 220:1-15.  Most significantly, Camp has not pointed to a comparator who was not terminated for failing to submit the necessary leave paperwork.  *See Lewis*, 918 F.3d at 1227 ("Ordinarily, for instance, a similarly situated comparator will have engaged in the same basic conduct (or misconduct) as the plaintiff.") (internal punctuation omitted).  Thus, Camp has not established a prima facie case because she has not shown that, relevant to her termination, she received less favorable treatment than comparators who were "similarly situated in all material respects."

---

[12] That a proffered comparator holds a different position does not necessarily mean the comparator is not sufficiently similar.  However, the fact that Kulper was in a non-management position explains why he allegedly was allowed to work any shift at any store he wanted.  Surely store managers, such as Camp, were expected to work at the store they manage and at certain times.  Moreover, Camp's comparisons to Kulper have nothing to do with Camp's termination, the adverse employment action giving rise to this disparate treatment claim.

But even if Camp had established a prima facie case, she still has not shown that the defendants' proffered reason for terminating her employment was pretextual.  The defendants state that Camp's employment was terminated because her leave of absence "was denied for failure to timely return the necessary paperwork to certify her leave and her absences therefore were unexcused and unapproved."  Doc. 22-14 at 9.  The record establishes that Camp was told that the paperwork was necessary for her leave to be approved, and Camp admits that she never returned the paperwork.

Camp first argues the defendants' legitimate, non-discriminatory reason is a pretext for discrimination because soon after she gave birth, Matt Hollis, her store manager, sent her a text message congratulating her and stating, "[y]ou can let me know how long your recovery time is and when you would like to return to work[.]"  Doc. 29-3 at 117.  There is no evidence Hollis was a decisionmaker or that he even knew when he texted Camp that she had been terminated because she failed to return the leave paperwork.  In any event, Hollis's statement that Camp could return to work in no way disproves the stated reason for Camp's administrative termination.  Circle K also made clear Camp could return to work.

Second, Camp argues that mailing leave paperwork to the wrong address is evidence of pretext.  Doc. 29 at 14.  This fact, when put in context, does not show that the defendants' reason for terminating Camp is unworthy of credence.  In fact, it supports the defendants' stated reason.  Anderson, Circle K's absence partner, reminded Camp multiple times that she must return the FMLA paperwork for her leave to be approved.  Anderson also instructed Camp how she could view the documents online, and she attempted to email a PDF of the documents to Camp as well.  Doc. 29-3

at 173.  But because of her claimed technical difficulties, Camp asked Anderson to mail the documents to her.  Doc. 29-3 ¶ 33; 29-4 at 157:23-158:2 ("I don't know if there was a malfunction with my phone or my Workday.  But that's why I said, mail me the paper. I want to hold it in my hand, and I'll send it back to you because this computer stuff ain't working.").  Camp, in the email asking for Anderson to mail the paperwork to her, did state that her "mailing address has temporarily changed," but Camp did not provide her current address to Anderson or confirm that Anderson had the current address.  Doc. 29-3 at 84.  Nor did Camp follow up with Anderson when she didn't receive the paperwork.  Doc. 29-4 at 162:4-163:7.  Under these circumstances, mailing the paperwork to the wrong address does not show "that the employer's proffered explanation is unworthy of credence."  *Burdine*, 450 U.S. at 256.

Next, Camp argues that the defendants' reason for terminating her was pretextual because Anderson told her that she was eligible for rehire.  Anderson emailed Camp on December 26, 2019 and stated, "I never received your paperwork to certify your leave, so you were terminated due to unapproved, undocumented leave as of 11/20/19.  You are able to be rehired, you would just need to present a doctor's release returning you to work.  I have notified the store manager of this as well."  Doc. 29-3 at 133.  That Circle K was willing to reinstate Camp if she simply got a doctor's release does not show that its reason for terminating Camp is unworthy of credence. Rather, it supports Circle K's desire for appropriate documentation and undermines Camp's claim that she was terminated because of discrimination.

Finally, Camp argues that although the defendants stated she was terminated for failing to return the leave paperwork, "when opposing unemployment benefits, Defendants stated that employment [sic] was due to poor performance."  Doc. 29 at 15. But other than this one sentence in her brief, which only cites a similar statement from her affidavit, Camp has not explained who made this statement, when the statement was made, or the facts surrounding the statement.  Moreover, Circle K's proffered reason for terminating Camp's employment is the same reason Anderson gave Camp on December 26, 2019, undercutting Camp's unsupported suggestion that the defendants have given inconsistent reasons for her termination.

In conclusion, Camp has not established a prima facie case of discrimination arising from her termination because she has not pointed to comparators who were "similarly situated in all material respects."  *Lewis*, 918 F.3d at 1218.  And even if she had, Camp has not come forward with evidence to show that the defendants' proffered reason for terminating her is unworthy of credence.  Accordingly, Camp's Title VII, ADA, and § 1981 claims arising from her termination are **DISMISSED with prejudice**.

## E.  Equal Pay Act Discrimination Claim

The Court has found that Camp did not properly exhaust her Title VII pay discrimination claim.  However, Camp also has alleged a pay discrimination claim pursuant to the Equal Pay Act ("EPA"), which does not require exhaustion.

An EPA Plaintiff establishes a prima facie case if she shows that her employer "pays different wages to employees of opposite sexes 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are

performed under similar working conditions[.]'" *Corning Glass Works v. Brennan*, 417

US 188, 195 (1974).  However,

> [o]nce a prima facie case is demonstrated, to avoid liability the employer
> must prove by a preponderance of the evidence … that the differential is
> justified by one of four exceptions set forth in the EPA.  Those exceptions
> are: "(i) a seniority system; (ii) a merit system; (iii) a system which
> measures earnings by quantity or quality of production; or (iv) a differential
> based on any other factor other than sex."

*Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995) (internal citations omitted).  The

employer's burden on its defense "is a 'heavy one[]' … because the 'defendants must

show that the factor of sex provided *no basis* for the wage differential.' …  If the

defendant fails to meet this burden, the court must enter judgment for the plaintiff."  *Id.*

(internal citations omitted).  If the employer carries this heavy burden, then "the plaintiff

must rebut the explanation by showing with affirmative evidence that it is pretextual or

offered as a post-event justification for a gender-based differential. … If plaintiff is able

to create the inference of pretext, there is an issue which should be reserved for trial."

*Id.* (internal citations omitted).

Camp alleges that while working as a customer service representative after her

demotion, Rader offered her a promotion to an assistant store manager position but no

increase in pay.  Doc. 29-3 ¶ 28.  Camp argues that African American and male

employees were given a raise when they took similar promotions.  *Id.*; Doc. 29 at 17.

However, it is undisputed that Camp's hourly wage was already more than two dollars

above the average for customer service representatives.  Docs. 22-1 ¶ 120; 29-1 ¶ 120.

Moreover, Camp's wage *as a customer service representative* was higher than twenty

of the twenty-two assistant store managers under Rader's supervision.  Docs. 22-1 ¶

121; 29-1 ¶ 121.  Finally, the two assistant store managers who were paid more than

Camp were Caucasian females.  Docs. 22-1 ¶ 122; 29-1 ¶ 122.  Based on these undisputed facts, Camp has not established that she was paid less than male employees for equal work and thus has not established a prima facie case. Accordingly, Camp's EPA claim is **DISMISSED with prejudice**.

## F.  Retaliation

In a single count of her complaint, Camp lumps together what she claims are claims for retaliation under Title VII, § 1981, the ADA, the EPA, and the FMLA.[13]  Doc. 1 ¶¶ 114-128.  Camp also does not organize the retaliation section of her brief by statute, protected activity, or adverse employment action.  *See* Doc. 29 at 18-23.  But it appears that she is bringing retaliation claims based on her demotion, and events between her demotion and her termination,[14] and her termination.

As discussed, Camp's Title VII and the ADA retaliation claims arising from her demotion are barred because she failed to exhaust her administrative remedies.  Had Camp alleged, as the parties apparently assume she did, a § 1981 retaliation claim, it

---

[13] In her brief, Camp *mentions*, but does not argue, an EPA retaliation claim.  But as discussed below, Camp, both in her complaint and in her sworn testimony, bases her retaliation claims on alleged complaints about sex discrimination and harassment and taking FMLA leave.  She never points to any opposition of pay disparity or other protected activity concerning compensation while employed with Circle K.  Because Camp did not allege an EPA retaliation claim, because she has abandoned that claim even had she alleged it, and because it patently lacks merit, her purported EPA retaliation claim is **DISMISSED with prejudice**.

[14] Camp appears to argue that, other than her demotion and termination, retaliatory conduct by the defendants included "Rader and Hollis subject[ing] Camp to heightened professional scrutiny, derogatory remarks, threats of adverse employment actions, and differential treatment.  Moreover, when Hampton [sic] complained about discrimination and harassment, Rader singled-out Camp for disciplinary actions while refusing to take action against other Store Managers for similar conduct."  Doc. 29 at 20.  However, the disciplinary actions that Rader took against Camp while she was a store manager happened before she even arguably participated in any protected activity.  Further, Camp has not alleged that Hollis knew anything about Camp's complaints, and there is no evidence or even an allegation that the actions by Hollis were taken in retaliation for Camp's complaints about Rader.  Most importantly, as discussed below, Camp has not established when she participated in protected activities, and she has not created a fact question about whether Rader was aware of any complaints.

would not be dismissed for failure to exhaust.  But she did not.  Camp's complaint clearly states that the defendants retaliated against her because she "repeatedly complained to Circle K's employees about unlawful employment practices based on gender/sex" and after she "exercise[d] her right to take medical leave, as provided by the FMLA."  Doc. 1 ¶¶ 119, 121.  Never does she allege any retaliation based on complaints concerning race.  *See Ferill v. Parker Group, Inc.*, 168 F.3d 468, 473 (11th Cir. 1999) (stating that § 1981 proscribes discrimination solely on the basis of race).  And in Camp's deposition, the defendants confirmed the bases for her retaliation claims were complaints about sex discrimination and taking FMLA leave.  Doc. 29-4 at 212:1-11.

Thus, Camp's only pled and exhausted retaliation claims are those based on gender/sex complaints and taking FMLA leave and which allegedly resulted in her termination.  But out of an abundance of caution, the Court addresses whether a properly alleged § 1981 retaliation claim based on Camp's demotion and events subsequent to her demotion could survive a motion for summary judgment.

When, as here, a retaliation claim is based on circumstantial evidence, the Court applies the appropriate *McDonnell Douglas* burden-shifting framework.  *Johnson v. Miami-Dade Cnty.*, 948 F.3d 1318, 1325 (11th Cir. 2020).  "[T]he prima facie case for retaliation requires the employee to show that: (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) she established a causal link between the protected activity and the adverse action."  *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181-82 (11th Cir. 2010) (citation omitted).

*1.  Purported Section 1981 claim arising from demotion*

The defendants argue Camp did not participate in any protected activities before

her October 2019 email to human resources.  Docs. 22-14 at 14-16; 34 at 15-16.  The

protected activity prong is satisfied under § 1981 not only for "'individuals who have filed

formal complaints,' but also those 'who informally voice complaints to their supervisors

or who use their employers' internal grievance procedures.'"  *Shannon v. Bellsouth*

*Telecomm., Inc.*, 292 F.3d 712, 715 n.2 (11th Cir. 2002) (quoting *Rollins v. Fla. Dep't of*

*Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989)).

Again, Camp asserts that she engaged in statutorily protected activity when she

complained about Rader before her March 14, 2019 demotion.  Doc. 29 at 18.  Camp

testified that she asked Surles, the manager of another Circle K, in "the Fall or Winter of

2018" who to contact about her problems with Rader.  Doc. 29-4 at 48:21-49:4, 248:18-

22.  In that discussion, Camp did not say her problems were based on race.[15]  Surles

suggested Camp contact Lisa Sorrow, and Sorrow directed Camp to human resources,

the procedure found in Circle K's associate handbook provided to Camp.  *Id*. at 129:24-

---

[15] Camp swore in an affidavit, filed in response to the defendants' motion for summary judgment, that "in the Fall-Winter of 2018, I first verbally complained about race and gender discrimination to Surles."  Doc. 29-3 ¶ 13.  But in her deposition, after testifying to the timing of her conversation with Surles, Camp further testified:

> Q: Do you recall what you discussed with Ms. Surles at that time?
> A: I said, if I feel like I have trouble with a supervisor, who do I go to?  I thought I was supposed to go to him when I had a problem.
> Q: And based on what you just told me, there was no mention of sexual harassment in this verbal communication with Ms. Surles, correct?
> A: No.

Doc. 29-4 at 48:21-49:4.  Although counsel did not expressly follow up to confirm that neither did Camp mention racial harassment, Camp's sworn testimony is clear—she did not mention to Surles the nature of her problem.  Because Camp has not explained the contradiction concerning the substance of her conversation with Surles, the Court may disregard this portion of Camp's affidavit as a sham.  *See Lane v. Celotex Corp.*, 782 F.2d 1526, 1532 (11th Cir. 1986).  But, as discussed, even accepting this affidavit, Camp has not argued that Rader was aware of the conversation, which occurred months before the demotion and thus is too remote to suggest any causal connection to the demotion.

130:2.  Camp called human resources to find out who she should speak with and was told to put her concerns in an email.  *Id*. at 130:19-131:7.  By the time Camp emailed human resources on March 16, she had already been demoted, and, even then, the email did not say what her issues with Rader were and did not mention any sort of discrimination.  *Id*. at 129:14-130:11, at 172.  Camp offers no evidence of when she spoke with a human resources representative or other Circle K employees about discrimination after the March 16 email, or if she did at all prior to October 2019, months after her demotion.[16]  Doc. 29-4 at 133:1-143:23.  And to the extent Camp did speak with human resources representatives before October, Camp describes these conversations as "[m]ostly me just trying to get somebody higher up to speak with." *Id*. at 142:12-15, 213:12-23.

In short, at no time prior to her demotion, did Camp complain about race discrimination[17] and thus she has not alleged, much less established, that she engaged in protected activity to support a § 1981 race retaliation claim.

Moreover, Camp has not established, or even argued, that Rader, the alleged decisionmaker, knew about any complaints of race discrimination, and she certainly has not pointed to any evidence suggesting a temporal proximity between complaints about race discrimination and her demotion.  *Id*. at 214:6-17 (Camp's testimony that she does not know whether Rader was ever made aware of her March 2019 email or her October

---

[16] In some places, Camp testified that she spoke with unknown human resources representatives on unknown dates about Rader.  Doc. 29-4 at 133:1-143:23.  But in other places, she testified that the only two complaints she made were the vague March email and the October email which stated, "[w]hen I told my market manager I was pregnant, I got demoted from a store manager and in turn lost my manager insurance."  Doc. 29-4 at 178; 213:12-214:2.

[17] Again, even accepting her affidavit testimony over her deposition testimony, there is no evidence, direct or circumstantial, that Camp's mention of race in a 2018 conversation with Surles had anything to do with her March 2019 demotion.

2019 email).  And of course, all this is confirmed by Camp's repeated insistence that Rader demoted her because of her pregnancy, not because of complaints about race discrimination.  Doc. 29 at 11.  Thus, even if Camp had alleged a claim of § 1981 retaliation, she has failed to establish a prima facie case of retaliation pursuant to § 1981 for multiple reasons.  Accordingly, Camp's retaliation claim arising from her demotion and subsequent treatment is **DISMISSED with prejudice**.

   *2.  Termination*

   The Court assumes without deciding that Camp has established a prima facie case of retaliation arising from her termination.  But the defendants have stated that Camp's employment was terminated for failure to return the necessary paperwork to approve her leave.  Doc. 22-14 at 9.  This, of course, is the same legitimate, non-discriminatory reason the defendants offered in response to Camp's disparate treatment claim, which Camp could not show was unworthy of credence.  Accordingly, Camp's retaliation claims based on the termination of her employment are **DISMISSED with prejudice.**

## G.  Convincing Mosaic

   Camp argues that the evidence in the record creates a convincing mosaic inferring discrimination and retaliation that may defeat the defendants' motion for summary judgment.  Doc. 29 at 23-28.  The Court recognizes that "establishing the elements of the *McDonnell Douglas* framework is not … the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case."  *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).  A plaintiff can always survive summary judgment by creating a triable issue concerning the employer's

discriminatory intent.  A plaintiff does this by presenting "'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'"  *Id.* (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011)).  Based on the evidence presented,[18] Camp has not established that a reasonable jury could conclude she was subjected to intentional discrimination or retaliation.

## H.  Camp's State Law Claims

Camp has asserted multiple state law claims including intentional infliction of emotional distress and negligent retention and supervision.  However, because the only claims over which the Court had original jurisdiction have been dismissed, the Court declines to exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367.  *See Baggett v. First Nat'l Bank of Gainsville*, 117 F.3d 1342, 1353 (11th Cir. 1997); *Mergens v. Dreyfoos*, 166 F.3d 1114, 1119, (11th Cir. 1999); 28 U.S.C. § 1367(c)(3) (A court may decline to exercise supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction.").  And although the parties are completely diverse for Camp's negligent retention and supervision claim, diversity jurisdiction under 28 U.S.C. § 1332 is defeated by Camp's intentional infliction of emotional distress claim, which is brought against both Circle K and Rader, a Georgia resident.  Doc. 1 ¶¶ 12, 129-36; *see Wis. Dep't of Corr. v. Schacth*, 524 U.S. 381, 389 (1998) ("Where original jurisdiction rests upon Congress' statutory grant of 'diversity jurisdiction,' this Court has held that one claim against one nondiverse defendant destroys that original jurisdiction."); *Exxon Mobil Corp. v. Allapattah Services*, 545 U.S. 546, 554 (2005)

---

[18] Counsel for Camp took no depositions and has relied almost exclusively on Camp's affidavit and deposition.

("Incomplete diversity destroys original jurisdiction with respect to all claims.").  Thus, each of the claims over which the Court had original jurisdiction have been dismissed. Accordingly, Camp's state law claims are **DISMISSED without prejudice** for lack of jurisdiction.

## IV. CONCLUSION

In conclusion, the defendants' motion for summary judgment (Doc. 22) is **GRANTED in part**.  Camp's unexhausted Title VII pay discrimination claim is **DISMISSED without prejudice** and her other federal claims are **DISMISSED with prejudice**.  Finally, Camp's state law claims are **DISMISSED without prejudice** for lack of jurisdiction.

**SO ORDERED**, this 7th day of February, 2022.

<u>S/ Marc T. Treadwell</u>
MARC T. TREADWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT